UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BLAKE WARNER, | : | 3:14-CV-1968 (JCH) |
|     Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | |
| MARISOL MEJIA, | : | MAY 5, 2016 |
|     Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 29)**

**I.  INTRODUCTION**

Plaintiff Blake Warner filed suit against defendant Marisol Mejia, claiming that Mejia falsely imprisoned him, thereby violating his Fourth and Fourteenth Amendment rights.  See Complaint at 3 ¶¶ 12-13 (Doc. No. 1) ("Compl.").  Mejia, the sole defendant in this case, moves for summary judgment.  See Defendants' [sic] Motion for Summary Judgment (Doc. No. 229) ("Def.'s MFSJ").

**II.  FACTUAL BACKGROUND[1]**

On December 9, 2013, Judge Richards of the Connecticut Superior Court in Bridgeport issued a Protective Order against Warner.  See Def.'s L.R. 56(a)(1) Stmt. ¶ 8.[2]  In that Protective Order, Warner was ordered, inter alia, to stay away from the home of his wife, Alyssa Taylor, and to surrender or transfer all firearms and ammunition.  See

---

[1] In connection with a motion for summary judgment, the court relies on the undisputed facts or, if a fact is disputed, the court views the evidence in the light most favorable to the party opposing summary judgment.  In this case, Warner does not dispute a single fact asserted by Mejia.  Compare Statement of Material Facts and Local Rule 56(a)(1) Statement in Support of Motion for Summary Judgment (Doc. No. 30) ("Def.'s L.R. 56(a)(1) Stmt.") with Plaintiff's Local Rule 56 Statement of Material Facts (Doc. No. 32-1) ("Pl.'s L.R. 56(a)(2) Stmt.").  Warner has also asserted certain facts that Mejia does not dispute.  See id.

[2] In her Local Rule 56(a)(1) Statement, Mejia mistakenly states that this Protective Order issued against Warner on December 9, 2014.  See id.  This must be a typographical error.  The actual Protective Order was included as an exhibit to Mejia's Motion for Summary Judgment, and a review of that Protective Order clearly shows that it was issued on December 9, 2013 – not December 9, 2014.  See Def.'s MFSJ Ex. E (Doc. No. 29-5) ("2013 Protective Order").

1

2013 Protective Order.  The Protective Order was to remain in effect until the court ordered otherwise.  Id.

On April 24, 2014, Warner was arrested and charged, on the basis of a complaint that he had occupied his estranged wife Taylor's apartment while she was on vacation, with violating the 2013 Protective Order.  See Def.'s L.R. 56(a)(1) Stmt. ¶¶ 5, 8.  That same day, Warner appeared before the same Judge Richards who issued the 2013 Protective Order.  Id. ¶ 7.  Judge Richards set bond at $45,000 and issued another Protective Order against Warner.  Id. ¶¶ 10, 11; see also Def.'s MFSJ Ex. G (Doc. No. 29-7) ("2014 Protective Order").  In this Protective Order, Warner was ordered, inter alia, not to contact Taylor, to stay away from her home, to surrender or transfer all firearms and ammunition, and to "[c]omply with the conditions of the Alert Notification / GPS program."  2014 Protective Order at 1-2; see also Def.'s L.R. 56(a)(1) Stmt. ¶¶ 11-12.  The Alert Notification / GPS Program – officially known as the Victim Notification Global Positioning System (GPS) Program – "is designed to provide the victim of domestic violence with advance notice that the offender is within 2,500 feet of the victim or the victim's home, and to notify the local police of the protected person's location so that they can respond accordingly."  Def.'s L.R. 56(a)(1) Stmt. ¶ 4.

Mejia is a clinical social worker employed by the State of Connecticut, whose duties include administration of the GPS Program.  See id. ¶¶ 2, 4.  In connection with Mejia's administration of the GPS Program to Warner, Mejia contacted Taylor and notified her that Warner would be posting bond and would be released, subject to the conditions of the GPS Program.  Id. ¶ 15.  Mejia also told Taylor that, upon release, Warner would be residing at the home of Matthew Espinoza, Warner's friend and

2

business associate. Id. ¶ 16. Upon being informed that Warner would be residing with Espinoza, Taylor informed Mejia "that Warner had given Espinoza a pistol to keep for him, and that she believed that the firearm was located at that address." Id. ¶ 17. Mejia then proceeded to pass this information along to the prosecutor handling Warner's case, Senior Assistant State's Attorney Kevin Dunn. See id. ¶¶ 18-19. Later that afternoon, a conversation was held between Mejia, Dunn, Espinoza, Henry Adams (who was Warner's bail bondsman) and Valerie Quarles, who was one of Mejia's colleagues. Id. ¶ 19. During that conversation, Espinoza confirmed that Warner would be living with him upon release and confirmed that Warner had given Espinoza a weapon to hold onto, which weapon was located at Espinoza's home. See id. ¶ 20.

Upon learning this information, Senior Assistant State's Attorney Dunn "determined that Warner had violated the provisions of the existing protective orders by failing to surrender or transfer all of his firearms, and that Warner would not be permitted to bond out without first surrendering the firearm located" at Espinoza's home. Id. ¶ 21. Thereafter, the bail bondsman Adams accompanied Espinoza to his home, where Adams took possession of the weapon and turned it over to the Trumbull Police Department on that same afternoon. See id. ¶¶ 26-32. After Adams turned over Warner's weapon and attempted to post Warner's bond, "there arose a question regarding whether Mr. Warner owned additional firearms which had not been surrendered." Id. ¶ 34. As a result, Dunn informed Adams "that he was not going to let Mr. Warner bond out until the questions in Mr. Warner's case were resolved, and that they had to talk to the judge." Id.

Mejia did not follow up to check on Warner's status after April 24.  Id. ¶ 35.  On both Friday, April 25 and Monday, April 28, Mejia was out of the office for professional training.  Id.  During Mejia's two-day absence from work, there were other social workers who could have, had they been contacted by Warner, registered him in the GPS Program had he so requested.  Id. ¶ 36.  Instead, Warner's attorney waited until April 29, when Mejia had returned to work, to inform Mejia that Warner was now prepared to "bond out."  Id. ¶ 37.  After confirming with both her supervisor and Dunn that Warner's gun had been surrendered, Mejia arranged for the GPS Program equipment provider to be present at the courthouse the following day.  Id. ¶¶ 38-39.  On April 30, Mejia met with Warner at the courthouse and "informed him of his responsibilities pertaining to the placement and use of the Victim Notification / GPS Program ankle bracelet."  Id. ¶ 41.  Thereafter, Mejia had "no further involvement" with Warner.  Id. ¶ 42.

Mejia "does not have authority to remand a prisoner to custody," id. ¶ 43, nor was Mejia the person who signed the order that "committed Blake Warner to the custody of the Commissioner of Correction on April 24, 2014," id. ¶ 47.

## III.   LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson,

4

477 U.S. at 256, and present such evidence as would allow a jury to find in his favor, see Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Graham, 230 F.3d at 38. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.   DISCUSSION

When assessing Warner's false imprisonment claim, the court looks to the law of the state in which the alleged imprisonment occurred – in this case, Connecticut. See Russo v. City of Bridgeport, 479 F.3d 196, 204 (2d Cir. 2007). "Under Connecticut law, false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Id. (internal quotations marks and alterations omitted); see also Green v. Donroe, 186 Conn. 265, 267 (1982). Accordingly, "[t]o prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant." Berry v. Loiseau, 223 Conn. 786, 820 (1992) (internal quotation marks omitted).

Additionally, under Connecticut law, a false arrest / imprisonment plaintiff must prove that there was no probable cause for his arrest / imprisonment. See Davis v. Rodriguez, 364 F.3d 424, 33 (2d Cir. 2004); see also Johnson v. Ford, 496 F.Supp.2d

209, 213 (D. Conn. 2007) ("It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest").  Relatedly, under Connecticut law, a false arrest / imprisonment plaintiff must be able to prove that the allegations that led to his arrest / imprisonment terminated in his favor.  See Miles v. City of Hartford, 445 Fed.Appx. 379, 383 (2d Cir. 2011).

It is undisputed that Mejia never had custody over Warner, nor did she ever have the ability to, much less did she ever, remand Warner to custody.  See Def.'s L.R. 56(a)(1) Stmt. ¶¶ 43, 47.  All Mejia did was pass along a piece of information to Dunn.  Once Mejia relayed that information to Dunn, it was Dunn who made the determination that Warner could not "bond out" until the issue surrounding the gun at Espinoza's home had been resolved.  Id. ¶¶ 21, 34.  In fact, as soon as Warner's attorney notified Mejia that Warner was ready to "bond out," Mejia started processing Warner's registration into the GPS Program, and Warner was released the following day.  Id. ¶¶ 37-42.

Therefore, based on the undisputed record, there is no evidence upon which a reasonable jury could find that Mejia restrained Warner's physical liberty, which is an element that Warner must prove in order to prevail on his false imprisonment claim.[3]  Accordingly, Mejia's Motion for Summary Judgment is granted.

## V.     CONCLUSION

For the above-stated reasons, Mejia's Motion for Summary Judgment (Doc. No. 29) is **GRANTED**.

---

[3] To the degree that anyone unjustly imprisoned or arrested Warner – itself a dubious proposition given that both the Protective Order already in place on April 24 and the Protective Order that issued on April 24 required Warner to turn over all firearms, which he had not yet done – it would be Dunn or someone affiliated with the Commissioner of Correction, who actually had custody over Warner on April 24, 2014.

**SO ORDERED**.

Dated at New Haven, Connecticut this 5th day of May 2016.

                                              /s/ Janet C. Hall
                                              Janet C. Hall
                                              United States District Judge